Filed 8/18/25  P. v. Rose CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>STACEY EUGENE ROSE,<br><br>   Defendant and Appellant. | A169778<br><br>(Mendocino County<br> Super. Ct. No. 22CR01238) |

After defendant Stacey Eugene Rose confronted his uncle while pointing an imitation AR15 style rifle at him, a jury convicted Rose of six charges.  Rose appeals his convictions for criminal threats, brandishing an imitation firearm, and vehicle tampering.  He argues that sufficient evidence does not support the criminal threats and brandishing an imitation firearm convictions.  Additionally, he contends that the amendment allowing two of the vehicle tampering charges was improper.  We reverse the two challenged vehicle tampering convictions and, in all other respects, we affirm the judgment.

## I. BACKGROUND

In 2022, Rose was charged with felony criminal threats (Pen. Code, § 422; count one)[1] and three misdemeanors: brandishing an imitation firearm (§ 417.4; count two); resisting a peace officer (§ 148, subd. (a)(1); count three); and tampering with a vehicle (Veh. Code, § 10852; count four). In January 2023, following the close of evidence at trial, the trial court granted the People's request to add two vehicle tampering charges (*ibid.*; counts five and six).

### A. Jury Trial

In May 2022, Rose lived with his wife, Bronwin, in a trailer on his family's property in Boonville. Other family members lived on the property in different houses, including Rose's uncle, Ed Walker, and Ed's daughter, Sheena Walker.[2]

Sheena testified that Rose and Bronwin had regular altercations. She had heard Rose yell at Bronwin and had seen Bronwin with bruises. At some point before the incident which led to these charges, Rose and Bronwin had another altercation. Bronwin left the property for the day and Rose spray painted their trailer with vulgar words about her.

Ed is a truck driver and hauls logs. He testified that on May 19, 2022—three days before the incident—he was leaving for work at 3:00 a.m. when Bronwin came to his truck, out of breath and wet. Concerned for Bronwin's safety, he told Bronwin to go with him to work. Bronwin told Ed that Rose had poured beer and water on her. When they returned to the property that afternoon, Bronwin seemed afraid so Ed invited her to stay at

---

[1] Undesignated statutory references are to the Penal Code.

[2] We refer to Rose's family members by their first names and intend no disrespect.

the house he shared with his mother. This created issues with Rose. Rose threatened to burn Bronwin's clothes and, at some point while Bronwin stayed at their house, Ed learned that Rose believed he and Bronwin were having an affair, which Ed denied.

Sheena testified that on May 22, 2022, she saw smoke coming from near Rose's trailer and she called her dad, Ed. She later heard noises sounding like brake lines or a hose being cut. When she looked out the window in the direction of her dad's logging truck, she saw Rose come from around the truck with a large gun the size of a rifle strapped across his back. The gun looked real.

Bronwin, who was in a different house, called 911. Sheena started videotaping Rose as he walked around Ed's logging truck. After she saw Rose tamper with Ed's logging truck and his Jeep, she called her dad. Rose walked away and then came around from the school bus that was on the property holding the gun and yelling. Sheena was scared and dropped to the ground because she thought he was coming at her with the gun. Eventually, she got her daughters and took them to her grandmother's house.

Ed testified to the following: After Sheena informed him that Rose may have deflated the tires on his logging truck, he went outside to check on the truck. When Ed was in the driveway he was "confronted by" Rose who came from around the school bus and asked where Bronwin was. Rose was a "loose cannon" that was "about to go off." Rose pointed an AR15 style gun at him and Ed testified, "it looked like he was going to shoot me." Ed thought the gun was real. Rose was upset, yelled obscenities at him, and threatened to kill him and everybody on the property, and Ed believed him. Ed was afraid for his life and his family's lives. He thought Rose was going to kill him. At some point, Ed told Rose that law enforcement was coming and slowly backed

away.  He walked back to his house where the family waited for law enforcement.  At the scene, both Ed and Sheena sought emergency protective orders.

The gun Rose pointed at Ed turned out to be an airsoft imitation rifle.  Ed had previously seen the gun in a ditch along the highway and thought it was a real AR15 rifle.  He realized it was fake when he picked it up.  He brought the gun back to the property and put it in his camp trailer, not in his house.  He did not handle the gun again, forgot he had it, and never talked with Rose about it.  The gun he retrieved from the ditch had an orange muzzle, which Ed testified toy guns must have as an identifier.  The gun Rose pointed at him did not have any orange on it; it was all black.  Ed suspected that Rose had taken the gun from his camp trailer and painted it black.  Additionally, Rose's gun had a sling holding it on his shoulder, but the gun Ed found did not have a sling.  Ed knew Rose owned guns, including rifles, but he had never seen Rose's gun collection and did not know whether he had an AR15.  Rose's guns had been taken away from him and were at Rose's parents' house.

Ed repeatedly testified that the gun Rose pointed at him looked like a real gun and he believed it was a real gun.  He stated, "I told the police that it was a AR15.  I -- at that time I had no idea that it was a toy.  It looked real to me."  Ed testified the gun looked real "because it had been painted black instead of with a red barrel like it should [have] had."  Ed testified, "I thought he was going to kill me.  I had no idea it was a toy."  While it was pointed at him, Ed thought it was a real gun and did not find out until later that it was an imitation gun.  He met with the prosecutor some point after the incident.  He did not think he told the prosecutor the gun was "phony," because it was the police who discovered the gun was not real.  Ed had been "told" that "it

was a phony gun." After he "found out that it was phony," he "told them it looked real . . . because it had been painted black instead of with a red barrel." At trial, nearly eight months later, Ed testified he still feared Rose and had been looking over his shoulder ever since the incident.

When Rose was apprehended, he was not holding a gun. A sheriff's deputy found the imitation gun on the property. Rose admitted to law enforcement that he had had a fake gun slung across his back. Two sheriff's deputies testified that the gun looked real. It "look[ed] the same as" the AR15 style rifle one of the deputies had in his patrol car. The deputies testified that the gun did not look like an imitation gun, which is supposed to have an orange tip at the muzzle. Rose's gun did not have an orange tip and looked like it may have been colored black.

## B. Verdict and Sentencing

The jury found Rose guilty of all six charges. The trial court suspended imposition of sentence and placed Rose on probation for two years subject to various terms and conditions, including that Rose serve 180 days in county jail, for which credits could be earned in a residential treatment program.

## II. DISCUSSION

Rose challenges his convictions for criminal threats and brandishing an imitation firearm, arguing that sufficient evidence does not support each conviction. Additionally, he challenges his convictions for the two vehicle tampering charges which were added during trial on the ground that the amendment was improper.

## A. Criminal Threats (Count One)

We review Rose's challenge to the sufficiency of the evidence under the substantial evidence standard, pursuant to which " ' "an appellate court reviews the entire record in the light most favorable to the prosecution to

5

determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' [Citations.] ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*In re George T.* (2004) 33 Cal.4th 620, 630–631.) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) Reversal is not warranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

To establish the offense of making a criminal threat under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T., supra*, 33 Cal.4th at p. 630.)

6

Rose only challenges the element of sustained fear. To demonstrate that Ed was in sustained fear requires "proof of a mental element in the victim." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Sustained fear "means a period of time that extends beyond what is momentary, fleeting, or transitory." (*Ibid*; see also *People v. Roles* (2020) 44 Cal.App.5th 935, 942.) Fifteen minutes has been held sufficient to constitute sustained fear. (See *Allen*, at p. 1156.) Even one minute may constitute sustained fear. "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*).) "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*Allen*, at p. 1156.)

Substantial evidence supports the conclusion that Ed was in sustained fear for his and his family's safety. Ed testified that while Rose pointed what he believed was a real gun at him, Rose threatened to kill him and his family. Ed believed Rose was going to kill him. There is no evidence regarding the specific length of time the confrontation lasted, but it was long enough for Rose to ask where Bronwin was, yell obscenities, and threaten Ed and his family. These facts and circumstances are sufficient to demonstrate sustained fear for the duration of the confrontation, even if it was brief. (See *Fierro*, *supra*, 180 Cal.App.4th at p. 1349.) After law enforcement apprehended Rose, Ed requested an emergency protective order, further suggesting sustained fear even though the confrontation had ended.

Rose concedes that Ed was in fear. He argues, though, that Ed's fear was not sustained. Rose asserts that at some point during the confrontation, Ed realized the gun was the imitation gun he had retrieved from the side of the highway. Rose argues Ed's fear could only "have lasted from the second

7

he glimpsed [Rose] holding the imitation firearm until moments later when he realized it was his own imitation firearm." Rose contends these "brief moments" are too fleeting to constitute sustained fear.

Rose's claim is belied by the record. There is no evidence, nor inference which may reasonably be deduced from the facts, that Ed realized it was an imitation gun during the confrontation. Instead, Ed repeatedly testified that he thought the gun was real. The gun Rose pointed at him did not have orange on it—unlike the gun Ed retrieved from the side of the highway which did have orange—and was all black. This fact is supported by the sheriff's deputies' testimony that the gun appeared real and did not have orange on it. Rose's gun had a sling holding it on his shoulder, while the gun Ed found on the highway did not have a sling. Ed testified that he learned later that the gun was fake and it was the police who determined the gun was fake. By the time he spoke with the prosecutor's office at some point after the incident, Ed had been "told" the gun was fake. Therefore, substantial evidence supports the conclusion that Ed did not know that the gun Rose held was an imitation gun during the confrontation. The evidence demonstrates that Ed learned the gun was fake after the confrontation ended, whether it was from the sheriff's deputies on the day of the incident or later from the prosecutor's office.

Moreover, even if we accept Rose's contention that Ed realized it was an imitation gun at some point during the confrontation, substantial evidence in the record still supports Ed's sustained fear. Ed testified Rose threatened to kill him, and Ed believed him. If Ed believed the gun was real for only "moments," as Rose urges, or even just one minute, "[w]hen one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Fierro*, *supra*, 180 Cal.App.4th at p. 1349.)

In his reply brief, Rose suggests that Ed's fear was not reasonable, an element of criminal threats distinct from the element of sustained fear which he challenges in his opening brief. To the extent that Rose argues Ed's fear was not reasonable, he waived such challenge by failing to raise it in his opening brief. (See *People v. Coleman* (2024) 98 Cal.App.5th 709, 724.) Therefore, we do not address it.

In sum, substantial evidence supports the jury's finding that Ed was in sustained fear. Therefore, we affirm the criminal threats conviction.

## B. Brandishing an Imitation Firearm (Count Two)

The offense of brandishing an imitation firearm requires proof that the defendant drew or exhibited "an imitation firearm . . . in a threatening manner against another in such a way as to cause a reasonable person apprehension or fear of bodily harm." (§ 417.4; see *In re Michael D.* (2002) 100 Cal.App.4th 115, 120.) Rose argues there is insufficient evidence to demonstrate that Ed reasonably feared bodily harm.

Substantial evidence supports the jury's determination that Ed reasonably feared bodily harm. As we discussed, *ante*, Ed feared Rose was going to shoot him. Ed's fear was reasonable because he thought the gun Rose pointed at him was real. (See *In re Michael D.*, *supra*, 100 Cal.App.4th at p. 126 [it was reasonable for a bystander who saw a teenager pointing what appeared to be a real gun at another boy on school grounds to fear for her safety and the safety of faculty and children at school].) Even assuming that Ed could have been in fear only for the time between when he saw Rose and when the confrontation ended—based on Rose's assertion that Ed knew by then that the gun was fake—Ed's fear during the time he believed the gun was real was reasonable. Rose cites no authority that any fear caused by

9

brandishing an imitation firearm must endure for some period. Therefore, we affirm the brandishing an imitation firearm conviction.

### C. Vehicle Tampering (Counts Five and Six)

Rose was initially charged with one count of vehicle tampering (count four) related to Ed's logging truck. After the close of evidence at trial, the trial court granted the People's request to amend the information to add two counts of vehicle tampering (counts five and six) related to two other vehicles—a Jeep and a Volkswagen. Rose argues the trial court prejudicially erred by permitting amendment to add counts five and six because no evidence was presented at the preliminary hearing that Rose tampered with those two vehicles. He contends evidence was presented only about the logging truck. The People concede that the amendment adding counts five and six was improper. We accept the concession and reverse the convictions on counts five and six. (See § 1009 [information cannot be amended "to charge an offense not shown by the evidence taken at the preliminary examination"].)

## III.   DISPOSITION

The judgment is affirmed in part and reversed in part. The vehicle tampering convictions on counts five and six are reversed. In all other respects, the judgment is affirmed.

_____

Langhorne Wilson, J.


WE CONCUR:



_____

Humes, P.J.



_____

Banke, J.




*People v. Rose*  A169778

11